## J. W. RUSSELL *v.* HANNAH MAKAINAI.

### No. 1944.

Argued June 6, 7, 1930.  Decided July 1, 1930.

Perry, C. J., Banks and Parsons, JJ.

518

OPINION OF THE COURT BY BANKS, J.

This is an action in assumpsit. There was a verdict for the plaintiff in the sum of $3856.84, followed by a judgment of $4007.29, which, besides the amount of the verdict, included costs and interest. The defendant brings the case here on exceptions.

The plaintiff is an attorney at law, located at Hilo, and is a member of the bar of this court. His complaint contains three counts. The first is for the reasonable value of his professional services, alleged to be $3500 and to have been performed for and on behalf of the defendant between May 26, 1927, and February 23, 1929, at her special instance and request and upon her promise to pay, in connection with certain litigation pending in the fourth circuit and the first circuit and in the supreme court of the Territory between her and one Solomon Lalakea 'and one Thomas Lalakea, a minor. The second cause of action is for divers sums of money alleged to have been advanced and paid by the plaintiff at the defendant's instance and request in connection with the litigation mentioned in the first count and aggregating the sum of $616.94. The third count is for moneys loaned to the defendant at various times between the 15th day of March,

1928, and the 9th day of February, 1929, and aggregating $440.

Defendant's answer to each count of the complaint contains a general denial and in addition gives notice that she will rely upon the "defenses of fraud, unprofessional conduct, lack of professional skill, failure and lack of consideration, failure of performance, payment and recoupment as to each of the three causes of action set forth in said complaint." By way of amplification it is further alleged in substance that the plaintiff intentionally or through his lack of professional skill so mismanaged the litigation mentioned in the first count of the complaint as to cause the defendant to lose a valuable interest in the property involved to her damage in the sum of $40,000. It is also alleged in substance that on May 26, 1927, the plaintiff through his fraudulent and unprofessional conduct induced the defendant to sign certain papers whereby he acquired and took into his possession the sum of $7500 of her money, which he still retains and which is more than sufficient to compensate him for all the professional services he rendered her.

To this answer plaintiff filed the following replication:

"I. That on or about the 26th day of May, 1927, the defendant above named was indebted to the plaintiff herein for legal services performed before that date and that, upon the said 26th day of May, 1927, the said defendant accounted with the said plaintiff of and concerning all sums of money from said defendant to the said plaintiff before that time due, owing and in arrear and then unpaid for said legal services rendered as aforesaid; and upon that accounting the said defendant was then and there found to be in arrear and indebted to the said plaintiff in the sum of $7,500.00, and the said defendant, in consideration thereof, upon and after said accounting and upon the said 26th day of May, 1927, then and there paid

to the plaintiff herein the said sum of $7,500.00 and the account which had heretofore existed between the plaintiff and defendant herein then and there became an account settled.

"II. That the services rendered, cash advanced for expenses, etc., and cash loaned to said defendant by the plaintiff herein, as alleged in the several causes of action stated in the declaration herein, were all rendered, advanced and loaned subsequent to the time, on May 26th, 1927, when the said account became an account settled as aforesaid.

"III. Further replying to said answer this plaintiff says that he denies all of the allegations of fraud, unprofessional conduct, lack of professional skill, negligence, failure and lack of consideration, failure of performance, payment and recoupment as in and by said answer alleged."

Aside from the issue presented by the complaint and the general denial thereto the pleadings present two other issues. Broadly speaking, these issues are, first, whether on May 26, 1927, there was an account stated between the plaintiff and the defendant for services rendered by the plaintiff prior to that date in the sum of $7500, and second, whether the plaintiff so negligently and unskillfully or intentionally mismanaged certain litigation in which he was employed to represent the defendant as to cause her to sustain a substantial loss which was in excess of the fees and other charges upon which the instant suit is predicated.

The court below did not submit the first issue to the determination of the jury but decided, as a matter of law, that such an account had been proven by the undisputed evidence. This view was indicated in two ways, first, by refusing to allow the defendant to offer evidence that the charge of $7500 for services rendered by the plaintiff up

to May 26, 1927, was extortionate and unreasonable, and second, by giving the following instruction at plaintiff's request. "You are instructed as a matter of law that, in arriving at your verdict with respect to the first cause of action above referred to, you must find from the evidence that a few days prior to the 26th day of May, 1927, the plaintiff and defendant accounted with each other as to the amount of indebtedness then due from the said defendant to the plaintiff for legal services performed for her up to and before that date; that it was then and there agreed between the said parties that the said defendant was then indebted to the plaintiff in the sum of $7,500.00 for legal services performed up to and before that date; that the defendant paid to the plaintiff herein the said sum of $7,500.00 in full settlement of said agreed amount of indebtedness for legal services performed up to and prior to that date; and that the said account theretofore existing between the said plaintiff and the said defendant then and there became an account stated and settled, which cannot now be reopened or reexamined. You are therefore instructed as a matter of law that in arriving at your verdict, with respect to the first cause of action stated in the declaration, you must disregard everything that took place prior to the 26th day of May, 1927, and you must find for the plaintiff on the first cause of action in such an account as the evidence shows those services to have been reasonably worth pursuant to the instructions hereinafter to be given."

The refusal to permit inquiry into the value of the plaintiff's services prior to May 26, 1927, and the giving of the instruction can only be upheld upon the assumption that there was no conflict in the evidence regarding a stated account. If there was conflict in the evidence in this regard the question of whether an account had been stated between the parties was one of fact to be decided

by the jury and not one of law to be determined by the court. Under proper instructions submitting this question, if the jury believed from the evidence that no such account was proven it was within its province to decide whether the sum of $7500 received by the plaintiff was sufficient compensation for all the services rendered by him, including those rendered prior to May 26, 1927, as well as those rendered subsequent to that date, and also whether in addition it was sufficient to reimburse the plaintiff for whatever advances of money the jury believed from the evidence he made in the defendant's behalf and whatever money he had loaned her. A careful reading of the transcript discloses that the court below was in error in thinking that a stated account was proven by the uncontradicted evidence.

It is true that the uncontradicted evidence shows that on May 26, 1927, Hannah Makainai signed a mortgage on certain described property to the Realty Investment Company, Limited, as security for a loan of $10,000 and that on the same date she signed the following order and that the plaintiff received the amount specified in the order:

"To The Realty Investment Company, Limited,
Hilo, Hawaii.
Gentlemen:

"Please pay to J. W. Russell, or order, the sum of seven thousand five hundred dollars ($7500.00) due him from me for legal services, and charge said amount to me as an advance on my mortgage to you of even date."

It is also true that evidence was given in behalf of the plaintiff which tended to show that the entire transaction, including the mortgage and order and for what services of the plaintiff the $7500 was intended as payment, was fully explained to the defendant and that she consented to it. For instance, the plaintiff, testifying in his own behalf

regarding what transpired between himself and the defendant at the time the mortgage and order were signed by her, said that the defendant stated to him that " 'Mr. Beers spoke to me about the mortgage and about settling my bills and told me you would have the papers ready to have them signed and I had prepared the papers.' * * * She didn't mention particular bills, merely 'Beers told me to settle my bills. He said I was to come up here and sign the mortgage papers.' I said, 'Did Mr. Beers talk to you about my fees?' She said, 'Yes.' I said, 'Did he explain about the $7500.00?' She said, 'Yes.' I said, 'Are you satisfied I am entitled to $7500.00?' She said, 'Yes, you do lot of work for me; you work hard for me.' She said, '$7500.00 is all right,' so I said to her that I had drawn up the papers but I did not have them there to sign; I had sent the original papers down to the Realty Investment Company and a copy of the papers to Mr. Beers so I told her to come in again. She came in on the morning of May 26th to sign the papers; I did not have the papers then so I went down and my best recollection is that she told me that she was going to Honolulu; if the papers were to be signed, she wanted them signed that day because she was going to Honolulu to take the children to school, so I went down and I told her to come back after lunch, so in the meantime I went down to the Realty Investment Company and got the papers. Then she came in again in the afternoon, so she signed the papers; she signed the papers there. I explained what they were; I told her about the mortgage; I read over to her the entire mortgage; possibly I did not read the entire description of the property; I explained what the papers were and then called in a notary public; Miss Adelaide Serrao came in and she executed the mortgage. I then told her that I had the $7500.00 order prepared but I didn't want her to sign it there in my office so I said, 'Let's go down

to the Realty Investment Company, and you turn over the mortgage to them and sign the papers down there.' Q Sign the what? A Sign the order down there; so we went down to the Hill Optical Co. The Realty Investment Company's office was adjoining; the rear office of the Optical Company used to adjoin the office of the Investment Company. So Mrs. Makainai came in; I went ·in there with Mrs. Makainai. Mr. Koehnen was in the back of the Hill Optical Company; Dr. Hill was in the back room of the Realty Investment Company; Dr. Hill came out. I said 'Here's the mortgage she has executed.' Now, I said, 'Here's the order for the $7500.00 that Mrs. Makainai is to pay me out of this money,' so I then said to Mrs. Makainai,—I said, 'Mrs. Makainai, that is correct, is it? You are to pay me $7500 for my services to date out of this $10,000?' She said, 'Yes.' I said, 'You are prepared to sign this order?' I read the order over to her. She sat down and signed the order."

The defendant's version of what occurred at the time she signed the mortgage and the order, as shown by the following quotations from her testimony, is quite different: "Q Now, do you recall a time in 1927 when you signed some papers, one of them being a mortgage of $10,000 on your interest in the Lalakea estate? That is just to fix the time; I just want to fix the time. A A paper was given to me and I was asked to sign; I signed it; I didn't know whether it was a mortgage. Q (To the Clerk) Give me that order. (Securing the same) I will show you here a paper with your name signed onto it, being plaintiff's exhibit 2, and after it is translated to you tell me what you remember or know about that paper, if anything. A Yes, I signed it. Q Well, now, before— What is that paper? Do you know? A I don't know the contents of it; I was asked to sign it and I signed it. Q Who asked you to sign it? A Dr. Hill was one and

Russell was the other. The paper was given to me and I was asked to sign. I wrote my name on it; I didn't know the contents of it. Q Did anybody say anything to you at that time why you should sign the paper or what was in the paper? A No. Q How did you come to be down to Mr. Hill's place that day? A On account of request made to me by Mr. Russell to take this down to Dr. Hill, take this paper down to Dr. Hill. Q Did Mr. Russell talk over with you at any time and tell you what was in that paper? A No. Q Well, why did you sign the paper? A Because I was told to do so by Mr. Russell. I had gone to him to ask for a loan of money and he gave me this paper to go down to Dr. Hill's. I took it down. I thought the paper meant that he was to give me a loan of money. Q Had you gone to Mr. Russell at other times and borrowed money? A Yes. Q Had Mr. Russell at those other times given you a paper to go to the bank or to go to any other place to get you money? A No, it was only to Dr. Hill where he told me to go to. Q Well, when you came to borrow money from Mr. Russell at other times, how did you get the money? Did he always hand it to you in cash or give you a paper to go and get it from some other place,—check or something like that to the bank or what? A Check. Q Did you sign a mortgage down there that same day for $10,000.00? A I signed a paper; I don't know how much it was for; a paper was given to me; I don't know whether it was a mortgage but I signed the paper. Q Did you get $10,000.00 there that day or any other amount, that is, any large amount? A I did not get $10,000.00 that day. Q Did you ever get $10,000.00? A I got some but in small amounts. I used to go for small amounts. Q Do you know how much you got in small amounts, how much the amount was? A No, I cannot remember. * * *
Q Well, now, before this time that you came down to see

Mr. Russell to borrow this money and he gave you this paper to go down to Hill, had Mr. Russell had any talk with you about mortgaging your property or anything of that kind or paying any attorney's fees by a mortgage? A No. Q Why did you sign those papers? Mr. Irwin: She has answered that question twice, if the court please, already. The Court: Let her answer. Mr. Irwin: All right. A I signed because I wanted some money. I went to Russell and asked him for money and he told me I would have to sign those papers; if I did so, I would get some money so I signed. Mr. Stafford: Q Did he tell you at any time that he was going to take—that that mortgage was for $10,000.00 and that he was going to take $7500.00 out for himself. Mr. Irwin: I object to that on the ground it is leading. Mr. Stafford: It is leading; I will agree with that. Q Did he say anything to you as to what was to be done with the money that you got on this mortgage? A No. Q I will ask you whether or not he said anything to you about taking $7500.00 of that money for himself for attorney's fees? * * * A No."

In another part of her examination in chief the following questions were asked the defendant, to which she gave the following answers: "Q Did you have any talk with Mr. Russell—whether you went to see him at his office or any other place—did you have any talk with Mr. Russell about the $7500.00 fee after you came back from Honolulu? A I knew nothing—I knew nothing about this $7500.00; Mr. Russell never said anything to me about that; I knew nothing about it. Q Yes, but after you found out about it down in Honolulu and came up here to Hilo, did you have any talk with Mr. Russell then sometime after you came back here about that $7500.00? A No." It is true the questions were directed to a time subsequent to the signing of the mortgage but the answers were broad enough to include a denial that she had at any

time had any talk with Russell regarding the fee of $7500, or that she ever knew anything about it.

On cross-examination as to what the plaintiff said to her when she signed the mortgage the defendant gave the following answers to the following questions: "Q Now, then, you went back again in the afternoon? A Yes. Q And he was in his office then? A Yes. Q You went into his private office, did you? A Yes. Q And what did Mr. Russell say to you? Repeat in English what he said to you at that time? (The interpreter interpreted the foregoing question to the witness.) The witness: A I want you to sign this paper. Q Yes. Anything else? A That was all. Q That was everything he said, 'I want you to sign this paper'? A Yes. Q You are absolutely sure of that? A Yes. Q What did you say in English? What did you say to him in English? (The interpreter interpreted the question to the witness.) The witness: A All he said to me, 'You sign this paper' and I sign. Q You didn't ask him what it was? The interpreter: A No. Q Was that all that was said at that time by Mr. Russell or by you? A Yes. Q Was that all that was done there at that time? A Yes. Q Well, didn't the notary public come in? A No. Q No. Nobody came in and took your acknowledgment to that instrument? A Only that girl secretary of his. Q Yes. Well, she came in, didn't she? A Yes. Q And what did she do? A She wrote on a paper but I don't know what she was writing about. Q And where was Mr. Russell when that was done? A He was there; he was at the door standing. Q And then what did you do? Now, that is all that Mr. Russell said at that time? He said, 'Sign this paper' and you signed it and you had no talk with him at all? That was all that was said with reference to that paper, was it? A All he said was 'Thank you.' "

528

We have, of course, only quoted excerpts from the testimony of the plaintiff and that of the defendant and it may be that other portions of the defendant's testimony show inconsistencies and contradictions but that is no reason for withdrawing from the jury the right to consider the portions of her testimony relating to an account stated, which we have quoted, and determine their evidential value. The portions we have quoted on that subject are clearly contradictory of the portions of plaintiff's testimony we have quoted and this is sufficient to present an issue of fact which it was the sole province of the jury to decide.

The court below made another ruling in connection with a stated account which we think was erroneous. When the plaintiff was under cross-examination he was asked this question: "All right. Now, we will go to this: You claim, as I understand it, that Hannah Makainai reasonably owed you for services in the ejectment suit $2500.00 and up to May 26, 1927, in the partition suit $5,000.00, a total of $7500.00?" Counsel for plaintiff made the following objection to this question: "We object to that on the ground it is incompetent, irrelevant and immaterial and not a part of this case. We haven't gone into the whole thing; we have proved an account stated; we put on preliminary and sound, substantial proof of an account stated up to May 26, 1927. We have gone into no details whatever with reference to things that took place before that time. We insist on the proposition that so far as the details of the work done before that time Hannah Makainai is precluded. The only reference made to what took place before that time was the reference to the $2500.00, which Paul Makainai voluntarily agreed to pay to Mr. Russell. We took that up for the purpose of meeting this insinuation and charge that Mr. Russell committed perjury at the time he signed the schedules in bank-

ruptcy. Now, if the court has any doubt as to the status of the case prior to May 26, 1927, we desire to go into it at the present time. We are going to insist and insist as forcibly as we can that so far as opening up the details of the transactions prior to May 26, 1927, the defendant is now precluded. We are going to ask the court to instruct the jury on that question. We pleaded an account stated. The authorities are unanimous and there is no exception to it whatever. The authorities are unanimous that they can't go behind an account stated. Generally, there are two things for them to do; they can either deny that there was an account stated, then they can go to the jury on that, or they can allege mistake or allege fraud and they are confined to the proofs of those issues. Those propositions of law are laid down clearly from the supreme court down." After argument on this objection the following occurred: "The Court: I think we can bring this to a head very quickly. It is your contention, as I understand you, Mr. Stafford, that regardless of fraud or mistake with reference to that account stated, that you may go into the details on cross-examination because of the character of the examination by the plaintiff at the opening of this trial? Mr. Stafford: Yes. The Court: The court will take the other view. Mr. Stafford: May I have an exception? The Court: You may have your exception." We think the action of the court in sustaining the objection to the question propounded to the plaintiff was erroneous.

In order to make our view on this subject clear it is necessary to refer to an action of ejectment brought by Hannah Makainai against her brother, Solomon Lalakea, reported in *Makainai* v. *Lalakea,* 25 Haw. 470. This action was commenced on December 27, 1918. Joseph Lightfoot, now deceased, was employed by Hannah to represent her in the case. The Laupahoehoe Sugar Company,

although not a party to the action but having some interest in the matter which it desired to have protected, employed J. W. Russell, the plaintiff herein, to represent it and paid him a fee of $1700. Later, and before the case was finally disposed of, Russell's services were dispensed with by his client. Lightfoot, conceiving that it would be desirable to have Russell associated with him in representing Hannah, agreed that if Russell would do so he (Lightfoot) would divide with him a fee of $5000 which Hannah had agreed to pay Lightfoot. Later Paul Makainai, the husband of Hannah, agreed with Russell that if Lightfoot did not divide the $5000 fee with him, he (Paul, if Russell would continue to assist Lightfoot) would pay him $2500 for his services. Lightfoot never paid Russell anything and Russell having continued to act with Lightfoot until the litigation was concluded Paul's obligation to Russell, it may be assumed, was absolute. Under these circumstances it was very pertinent to inquire of Russell whether in his account against Hannah of May 26, 1927, he included his services in the ejectment suit and valued them at $2500 and valued his services in the partition suit up to May 26, 1927, at only $5000. In other words, if there was no stated account between Russell and Hannah, as the jury on the conflicting evidence might have found if the question had been submitted to it, and Russell, on May 26, 1927, received from Hannah $2500 for which she was not liable, she was entitled to a credit of this amount for the services rendered by Russell subsequent to May 26, 1927, and for which the instant action was brought.

There is another reason why we think the question propounded to the plaintiff should have been allowed. Assuming that the defendant agreed to plaintiff's account of May 26, 1927, her agreement would not be binding on her if Russell, who was at that time her attorney and

therefore owed her the duty of the utmost frankness, failed to disclose to her anything in connection with his charge for services that it was his duty to disclose, and which if disclosed would have induced her to withhold her consent. Applying this obviously sound principle, if Hannah agreed to pay Russell $7500 for services rendered by him prior to May 26, 1927, and included in this amount was an unauthorized charge of $2500 for services in the ejectment suit, it was Russell's duty to her to inform her that she was not indebted to him for these services and if he failed to give her this information such failure would be a fraud on her which would relieve her of any liability on a stated account.

Regarding the second of the two issues above mentioned the litigation which the plaintiff is charged with having mismanaged was instituted by Hannah Makainai, the defendant herein, against her brother, Solomon Lalakea, on November 14, 1924, and was for the purpose of obtaining a partition of certain lands in which Hannah claimed an undivided one-seventh interest in fee simple. The history of this case is fully recited in *Makainai v. Lalakea*, 30 Haw. 323, and need not now be repeated. The final outcome of the partition suit, as shown by the record, was that Hannah was decreed to be the owner of a life estate and not the owner in fee simple of an undivided one-seventh interest in the land. This was due to the fact that after the interlocutory decree was entered in the partition suit awarding to Hannah a fee simple title to the one-seventh interest claimed by her there was born to Solomon a son named Thomas K. Lalakea, who, upon his petition, was allowed to intervene and propound his claim to an interest in the land and was thereafter decreed to be the owner in remainder of the fee simple interest claimed by Hannah, subject to a life estate in her.

It is contended by the defendant that if the plaintiff

had prosecuted the partition suit with reasonable expedition and skill a final decree would have been entered and the partition completed before Solomon Lalakea's son, Thomas K. Lalakea, was born and Hannah's fee simple interest would thus have been incontestably secured to her. We cannot agree with this contention.

Whether in a partition suit, involving as it sometimes does under our statute a trial of the title, a guardian *ad litem* can be appointed for unborn children need not be determined. The present defendant's complaint against her attorney is that he did not in commencing the partition suit so prepare the summons as to bring within the jurisdiction of the court the unborn children and heirs of Solomon Lalakea and that he did not hasten the conduct of the suit so as to bring it to a final decree before the birth of Thomas K. Lalakea. If under our statute relating to the partition of lands or under unwritten law a guardian *ad litem* for unborn children cannot be appointed in such a suit as this and if unborn children cannot be bound, through the medium of a guardian *ad litem*, by a partition decree, Mr. Russell, the present plaintiff, was not guilty of any negligence or mismanagement in failing to secure the issuance of such a summons as it is contended by the defendant should have been issued. On the other hand, if in a partition suit unborn heirs can be lawfully summoned into court and can, through the medium of a guardian *ad litem*, be bound by the decree, the presumption must be that upon the issuance of such a summons calling in unborn children the court would do its duty of promptly appointing a guardian *ad litem* to represent them and it must be further presumed that the guardian *ad litem* would conscientiously and effectively represent his wards and secure for them the interest in the lands to which they are entitled—in the instant case a fee simple title in the remainder. In either event, it

appears, the attorney was not guilty of any negligence or mismanagement in failing to secure a summons calling in unborn children or in failing to hasten the entry of the final decree.

Since because of the errors pointed out a new trial must be granted, we think if the defendant is able to furnish evidence that is competent and relevant in support of her claim that in other respects the plaintiff mismanaged to her financial detriment the litigation in which he was employed to represent her, she should be allowed to introduce such evidence.

The exceptions presenting the errors above mentioned are sustained. The other exceptions are not of sufficient merit to require discussion.

The verdict is set aside and a new trial is granted.

*H. Irwin* (also on the briefs) for plaintiff.

*H. E. Stafford* (also on the briefs) for defendant.

# IN THE MATTER OF THE ESTATE OF CHING LUM, DECEASED.

## No. 1940.

FILED JUNE 12, 1930.　　　　　　　　DECIDED JULY 2, 1930.

PERRY, C. J., BANKS AND PARSONS, JJ.

*Per Curiam.* This is a petition for a rehearing. There is no complaint that what we decided was wrongly decided but that we omitted to decide two questions upon which the petitioner thinks she was entitled to a decision. The first of these questions is whether the temporary administrators were estopped to deny that the petitioner was the lawful wife of their intestate if she was deceived into a

marriage with him by his false representations that he had no wife living at the time. The second question is whether a woman deceived into an illegal marriage is entitled to relief in the nature of the relief provided for a lawful widow by section 2487, R. L. 1925. We thought at the time the original opinion was prepared, and we still think, that neither of these questions was involved in the case before us.

*Huber, Kemp & Stainback* and *A. J. Busheck* for the petition.